UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MIRNA E. MARTINEZ-SANTIAGO,

Plaintiff,

-against-

ZURICH NORTH AMERICA INSURANCE CO.,

Defendant.

07 Civ. 8676 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

Plaintiff brings an action for employment discrimination against her former employer, defendant Zurich North America Insurance Co ("Zurich"). She alleges (1) that when returning from maternity leave following the birth of her child, her request to work from home was denied because of her race, and (2) that after she complained about the discrimination, Zurich retaliated with unfair criticism of her work and the disproportionate assignment of new files. Defendant moves for summary judgment on all counts. For the reasons that follow, defendant's motion is GRANTED in its entirety.

**BACKGROUND**

Taken in the light most favorable to plaintiff, as the party against whom summary judgment is sought, the record, which includes depositions, declarations, and documentary exhibits from plaintiff as well as relevant employees at Zurich, indicates the following.

Plaintiff was formerly employed by Zurich as claims counsel in Zurich's Professional Liability Department in New York. Zurich is a commercial property-casualty insurance provider. (Def. 56.1 Stmt. ¶ 1; Troisi Decl. ¶ 1.) Plaintiff previously

worked as an attorney at the law firm Schoeman Updike, but for various reasons unrelated to this action decided to move on. (Pl. Dep. 29.) She applied to Zurich in the summer of 2002 and was interviewed by Chris Troisi, Damiano Servidio, and Brian Baney. (Pl. Dep. 30.) Troisi, and possibly the others, recommended her for the position. (Troisi Decl. ¶ 2.) Troisi is one of the decision-makers at Zurich accused of discriminating against plaintiff because she is African-American and Hispanic.

Plaintiff commenced employment with Zurich in September 2002. (Def. 56.1 Stmt. ¶ 3.) Claims counsel at Zurich are assigned to a department and to a particular team and team leader within that department. Damiano Servidio was the overall supervisor for the Professional Liability Department. (Pl. Dep. 61-62.) Troisi and Baney were the two team leaders within that department, and plaintiff was assigned to Troisi's team. (Def. 56.1 Stmt. ¶ 14, Pl. Dep. 43.) Accordingly plaintiff reported to Troisi as her direct supervisor, and he oversaw her day-to-day work, conducted her performance evaluations, and decided her requests for raises and other discretionary benefits. Baney did the same with respect to members of his team, and both reported to Servidio who occasionally had input into those decisions.

Plaintiff's starting salary at Zurich was $78,000, and she was allotted 22 days of paid time off ("PTO"). (Def. 56.1 Stmt. ¶ 47.) Six other claims counsel were hired in the Professional Liability Department in 2002 and 2003. They were: C. Cannistraci, paid $78,000 with 22 days PTO; E. Millard, paid $75,000 with 22 days PTO; S. Greitzer, paid $78,000 with 24 days PTO; G. Schmidt, paid $75,000 with 24 Days PTO, C. Butera, paid $82,000 with 24 days PTO; and E. Schwartz, paid $80,000 with 24 days PTO. (*Id.*, Reale Decl., ¶5, Ex. A.) All of the hires other than plaintiff were white. (*Id.*)

As a claims counsel, plaintiff managed a caseload of potential claims, pre-lawsuit claims, and lawsuits. (Def. 56.1 Stmt. ¶12.) She was responsible for the tasks attendant to processing her claims (or 'files'): analyzing whether there was coverage, issuing coverage and reservation of rights letters, negotiating settlements, and assigning counsel as necessary. (Def. 56.1 Stmt. ¶ 13.) She was also tasked with staying up to date on her files by maintaining a diary system, and maintaining a record of her progress on each case. (*Id.*) During her full-time employment, she generally maintained around 150 to 170 claims. (Def. 56.1 Stmt. ¶ 75.)

Plaintiff was a good employee at Zurich. On the company's standardized performance evaluation, anything above a 1.0 was considered a good score, and plaintiff scored a 1.07 on the year-end review for 2003. (Nuwesra Decl. Ex. D.) Troisi conducted her performance evaluations, and used them both to compliment plaintiff on her work and to provide constructive criticism on areas in which she needed improvement. For example, in the 2003 year-end evaluation he commented that plaintiff's "main strength is in evaluating claims and negotiating settlements. She is aggressive and is always willing to actively participate…." (*Id.*) However he also noted that plaintiff was "still working on issuing timely coverage letters and using a diary system," and that he expected her to "improve in timeliness of reserve changes." (*Id.*)

On or around November 5, 2003, plaintiff received a four percent raise. (Def. 56.1 Stmt. ¶ 22.) Unhappy that the raise was less than she had requested and less than she felt she deserved, she told Troisi by e-mail that she "couldn't help but be disappointed by the amount of my raise…I like to think that Zurich is the kind of

Company that rewards both loyalty and good work."  (Reilly Decl. Ex. 1.) (also

explaining specific ways that her work had profited the company).  Troisi replied:

> Mirna,
>> I am sorry that you are disappointed with your raise.
>> [paragraph complimenting plaintiff on her strengths as an
> employee]
>> However, I have also told you the need for improvement in certain
> areas and discussed this with you today.  I have discussed with you many
> times your need for a better diary system and better organizational skills.
> As you'll recall, there were several occasions where coverage letters, even
> denials did not go out timely.  In addition, the quality of the letters has
> only just improved to the point where I no longer need to review your
> reservation of rights letters.  Overall, lack of follow up has been a
> problem.
>> Again, I still believe this is a fair raise based on overall
> performance.  If you wish to discuss this further, please let me know.

(*Id.*)  Plaintiff now believes that "it appears that Mr. Troisi's hostility towards me began

after I questioned the inadequate raise."  (Pl. Decl. ¶ 26.)  She has not asserted that race

was a factor in that decision, however.

On or about December 23, 2003, plaintiff submitted a request to work from home

part of the week pursuant to Zurich's Alternative Work Arrangement policy ("AWA").

(Def. 56.1 Stmt. ¶ 23.)  At that time she was an expectant mother, and her doctor

confirmed in writing that it was necessary for her to do some of her work from home in

the weeks leading up to her due date.  (Pl. Dep. 158:13-24, Ex. H.)  Zurich's AWA policy

provides that

> [t]o the extent job responsibilities and business needs can accommodate
> flexible work arrangements, the Company encourages managers to work
> with employees to explore options that will enhance employee satisfaction
> and retention while continuing to meet product and service
> standards….This policy applies to all employees.  In addition, you must
> have:
> - ability to meet department and Company-wide business goals
> - proven record of achieving high performance
> - adequately shown you can perform job within the proposed

Flexible Work Arrangement option

(Def. 56.1 Stmt. ¶ 8.)  When employees request an AWA, they fill out and sign a request form that stipulates, *inter alia*, that "telecommuting is not a substitute for dependent care," and that "[i]f a dependent is home during working hours, I understand that another responsible adult must be present to provide primary care and supervision."  (Def. 56.1 Stmt. ¶ 10.)  Plaintiff filled out and signed one of these forms.  (Def. 56.1 Stmt. ¶ 25.)  Troisi approved the request after referring her to human resources to fill out documentary forms regarding the medical basis for the request.  (Def. 56.1 Stmt. ¶ 24; Pl. Counter 56.1 Stmt. ¶ 24.)  To facilitate her working from home plaintiff was provided with a laptop on which she could access her files, and Troisi agreed that if she needed anything faxed while working at home he would do it for her.  (Troisi Dep. 81:19-23.)

Following the birth of her child (a baby boy), plaintiff began maternity leave on January 23, 2004.  (Pl. Decl. ¶ 10; Pl. Counter 56.1 Stmt. ¶ 27.)  At the end of her statutory maternity leave, plaintiff requested a leave of absence, which was granted. (Def. 56.1 Stmt. ¶ 28; Troisi Decl. ¶ 5.)

In early April 2004, plaintiff called Troisi and requested that upon her return to full time employment she be permitted to telecommute a few of the days each week, in order to observe the level of care being given to her son by the new caretaker.  (Pl. Dep. 156.)  She explained that the accommodation would only be "temporary" while she resolved what had been an unanticipated baby-care issue, and that her mother, mother-in-law and husband would also be looking after the baby on the days she was telecommuting.  (Pl. Decl. ¶ 10.)  Troisi told her that he would need to talk it over with Baney, who had at that point replaced Servidio as supervisor of the Professional Liability

Department and who was thus Troisi's immediate supervisor. (*Id.* ¶ 11.) In mid-April, Troisi called plaintiff and told her that the request to telecommute was denied. He told plaintiff that she could either return full time in the office or request to work part time in the office under an AWA. (*Id.* ¶ 11-12.) It is this decision that generated this litigation.

Plaintiff claims that she responded to Troisi's initial denial of the request in mid-April by immediately and "in no uncertain terms" objecting that she "felt [she] was being discriminated against." (Pl. Decl. ¶ 11.) On April 21 she submitted another request to either work full time but telecommute a few days each week (as originally requested), or to work only in the office but part time. Troisi granted the part time aspect of that request. (Def. 56.1 Stmt. ¶34; Troisi Dep. 106:4-13l.) Plaintiff returned to work part time in early May. On May 21 plaintiff submitted a renewed request to work full time, but work at home a few of the days each week, or alternatively to extend her part-time status working at the office. Troisi permitted her to continue working part time in the office, but required her to switch to full time status by July 5, 2004. (Def. 56.1 Stmt. ¶ 38.)

Upon plaintiff's initial return in early May, plaintiff received a bulk transfer of about 80 claims that had previously been handled by claims counsel Christine Miller. (Def. 56.1 Stmt. ¶ 77; *Id.* at ¶ 84; Pl. Dep. 131-132, 230-231.) All of plaintiff's claims had been transferred to another claims counsel after plaintiff left for maternity leave. (*Id.*) She also subsequently received smaller bulk transfers. On June 23, 2004, plaintiff had a total of 145 files, (Pl. Decl. ¶ 20), and on June 30, 2004 she had 110. (Def. 56.1 Stmt. ¶ 87.)

Throughout her employment with Zurich, and with slightly greater frequency upon her return from maternity leave, Troisi from time-to-time emailed or phoned plaintiff with reminders and suggestions pertaining to certain files that needed her attention.  At least five times in the year prior to her maternity leave plaintiff received such emails from Troisi. (Pl. Dep. Ex. Q, Ex. R, Ex. S, Ex. T, Ex. U.)  After her return, she received at least five such emails in the four months that she remained in Zurich's employ.  (Pl. Dep. Ex. V ("Your count is high…maybe you could drop these to file and keep a separate list of files you need to review?"); Pl. Dep. Ex. W ("[A client] called me today.  He indicated that he had left a couple of messages for you and was concerned…"); Pl. Dep. Ex. X ("Take a look at this file.  Looks like it may be a potential claim… but there are no Znotes"); Pl. Dep. Ex. Z ("I sent you a few e-mails the other day regarding the files listed below.  There are still no znotes or reserves.  Please let me know… if you need assistance in any way.")).

Plaintiff resigned her employment with Zurich in late July 2004, effective August 6, 2004.  (Pl. Dep. 105-111.)  She claims that she "felt compelled to resign" because she was "deterred by defendant's harassing and discriminatory conduct."  (Pl. Decl. ¶ 21.)  In late August 2004 plaintiff commenced similar employment at Liberty Insurance Company.[1]  (Pl. Dep. 120-121.)

Subsequently plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging discrimination in the telecommuting request decision, and retaliation when she complained about it.  The EEOC issued a determination on

---

[1] Plaintiff had applied for a job at Liberty Mutual insurance company in June of 2004.  (Pl. Decl. 113.)  She had a friend from law school who was working there, and her friend invited her to apply for a position.  She interviewed with Liberty twice prior to her resignation from Zurich.  (Pl. Decl. 111-112.)  "Almost immediately" after resigning from Zurich she got the job with Liberty, where she made a higher salary and was permitted to telecommute a few days each week.  (Pl. Dep. 120-121.)

September 29, 2006, concluding that plaintiff "was discriminated against based on her race (Black) in retaliation for protesting unlawful employment activities."  On June 29, 2007 the EEOC issued a right to sue letter, and thereafter plaintiff timely filed this suit.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c) summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  A party moving for summary judgment—in this case defendant Zurich Insurance—may discharge its burden "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

Federal Rule of Civil Procedure 56(e) requires that a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  This requirement has particular value when a party's responsive documents are long on speculation and short on specific facts.  "[S]peculation alone is insufficient to defeat a motion for summary judgment."  *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir. 2006).  "The law is well established that conclusory statements, conjecture, or speculation are inadequate

to defeat a motion for summary judgment." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005).

Trial courts must be particularly cautious about granting summary judgment in the employment discrimination context. "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994) (internal citations omitted). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 596, 603 (2d Cir. 2006). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Courts are not to "treat discrimination differently from other ultimate questions of fact." *Id.* However they still must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir. 1999).

### DISCUSSION

Plaintiff has asserted claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, New York Executive Law § 290 et seq., and the Administrative Code of the City of New York, and defendant has moved for summary judgment on all claims. The state and city law claims are subject to the same analysis as claims under Title VII, so they can be analyzed together. *See Weinstock v. Columbia*

*Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000) (stating that New York state and city

discrimination claims are subject to the same Title VII analysis); *Sullivan v. Newburgh*

*Enlarged Sch. Dist.*, 281 F.Supp.2d 689 (S.D.N.Y. 2003).

## I.  Alleged Discriminatory Denial of Request to Telecommute

Following the end of an extended maternity leave, defendant denied plaintiff's

request to telecommute a few days each week on a temporary basis.  Plaintiff contends

that this decision was based on her race in violation of Title VII of the Civil Rights Act of

1964.  Title VII prohibits discrimination "against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

Title VII discriminatory treatment claims are generally analyzed using the three

step burden-shifting approach first laid out in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1972).  Now a well known and established procedure for analyzing

discrimination claims, the *McDonnell Douglas* test is applied as follows.  First, the

plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Id.*;

*Williams v. R. H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004).  If the *prima facie*

case is made the employer is rebutably presumed to have violated Title VII.  Then the

burden shifts to the employer who must provide a legitimate, nondiscriminatory business

rationale to justify the allegedly discriminatory decision.  *Texas Dept. of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 248 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802).  If the

employer provides such a reason, the presumption created by the *prima facie* case "drops

out."  *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001).  The plaintiff can then

prevail by "prov[ing] by a preponderance of the evidence that the legitimate reasons

offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.

The first step requires the Court to determine if plaintiff has established the four elements of her *prima facie* case of discrimination. At the summary judgment stage, the "burden that must be met by an employment discrimination plaintiff…is de minimis." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citations and quotation marks omitted). The *prima facie* case requires that (1) plaintiff is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See e.g. Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). Neither party contests that plaintiff is a member of a protected class or that she was qualified for her position, so only the latter two elements, an adverse employment action and circumstances giving rise to an inference of discrimination, are seriously in dispute here.

### A. Adverse Employment Action

As to the adverse employment action element, plaintiff alleges that "the fact that her hours of work were reduced by 40% is an adverse employment action." (Pl. Opp. 12.) It is undisputed, however, that plaintiff always had the option of working full time from the office; plaintiff's real complaint, then, is that the denial of the telecommuting request constituted an adverse employment action.

An adverse employment action is a "materially adverse change in the terms and conditions of employment," and it is "more disruptive than a mere inconvenience." *Galabya v. New York City Board of Ed.*, 202 F.3d 636 (2d Cir. 2000) (quoting *Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 126 (7th Cir. 1993)). "[A] plaintiff must

show that the conduct complained of materially 'affected the terms, privileges, duration, or conditions of … employment.'" *Montanile v. National Broadcast Co.*, 211 F.Supp.2d 481, 486 (S.D.N.Y. 2002) (quoting *Cooper v. New York State Dep't of Human Rights*, 986 F.Supp. 825, 828 (S.D.N.Y. 1997); *Dortz v. City of New York*, 904 F.Supp. 127, 156 (S.D.N.Y. 1995)). "Mere changes in working conditions that cause some inconvenience do not constitute adverse employment actions as a matter of law." *Montanile*, 211 F.Supp.2d at 486 (determining that loss of overtime pay, modification of duties, and change of desks "did not rise to the level necessary to constitute a materially adverse employment action.").

The denial of plaintiff's telecommuting request was a short term inconvenience that did not rise to the level of an adverse employment action. Although the Second Circuit has not ruled on whether denial of work-from-home or telecommuting status constitutes an adverse employment action, other courts in this and other circuits have consistently found that it does not. *See Smith v. AVSC Int. Inc.*, 148 F.Supp.2d 302, 313 (S.D.N.Y. 2001) (concluding that "not allowing [the plaintiff] to work from home…[did] not constitute adverse employment action[] as a matter of law" for purposes of the *prima facie* case); *Brockman v. Snow*, 217 Fed. Appx. 201, 205 (4th Cir. 2007) (finding that denial of pregnant employee's medically supported request to telecommute was not adverse employment action where option of part-time work was offered); *Seldon v. National R.R. Passenger Corp.*, No. 05-4165 2007 U.S. Dist. LEXIS 81183 at *8 (E.D. Pa. Oct. 25, 2007) ("Amtrak's refusal to allow her into a small pilot program that would alter only the location of her work" not adverse employment action); *Homberg v. UPS*, 2006 WL 2092457, at *9 (D. Kan. July 27, 2006) (telecommuting is a personal

preference, denial of request was not an adverse employment action); *Haas v. Zurich North America*, No. 05-1421, 2006 U.S. Dist. LEXIS 75010, at *13 (N.D. Ill. Sept. 29, 2006) (finding that "[t]he fact that [plaintiff's supervisor] did not permit [plaintiff] to work from home every time she requested is also not an adverse employment action"); *Daniels v. FRB of Chi.*, 2006 WL 861969, at *12 (N.D. Ill. Mar. 31, 2006) (refusal of request to permit telecommuting not adverse employment action); *Ashton v. AT&T Corp.*, 2005 WL 2320899, at *6 (D.N.J. Sept. 22, 2005) (same); *Cruz v. Perry*, 2003 WL 1719995, at *6 (N.D. Ill. Mar. 31, 2003) (same); *Melton v. Farmers Ins. Group*, 619 F.Supp.2d 1131, 1139 (W.D.Okla. 2008) (ADA context); *see also Little v. New York*, No. 96-5132, 1998 WL 306545, at *5-6 (E.D.N.Y. June 8, 1998) (finding that involuntary transfer to another work location is not an adverse employment action, because "[t]he realities of the workplace dictate that employees do not always have the option to work in the location they desire. Employees must often go where the employer determines they are needed most…"). While there may be some situation where the denial of a request to work from home qualifies as an adverse employment action, this is not such a case. Plaintiff's request to telecommute was for a brief period of time, during which plaintiff wanted to observe the level of care being provided by a new child caretaker. (Pl. Dec. ¶ 10.) Defendant did not testify as to her definition of "temporary," however, given the nature of her request the period could not have been more than a month or two. Defendant's denial of plaintiff's request to telecommute for a limited number of days may have inconvenienced her, and perhaps heightened her natural concerns about her child's care, but it did not effect a materially adverse change in her terms and conditions

of employment.  Accordingly, plaintiff has failed to establish a necessary element of her *prima facie* case.

### B.  Circumstances Giving Rise to an Inference of Discrimination

Even if plaintiff had suffered an adverse employment action, the fourth prong of the *prima facie* case for employment discrimination would not be satisfied because the circumstances surrounding Zurich's decision do not give rise to any inference of discrimination.  "It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to…the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Leibowitz v. Cornell University*, 584 F.3d 487 (2d Cir. 2009).

Plaintiff contends that other similarly situated white employees were allowed to work from home, and that a comparison of her situation to theirs gives rise to an inference of discrimination.  The fourth element of a *prima facie* employment discrimination case can indeed be satisfied by showing that the employer "treated [the employee] less favorably than a similarly situated employee outside his protected group." *Graham v. LIRR*, 230 F.3d 34, 39 (2000).  However the Second Circuit has said that a plaintiff "must show she was similarly situated in all material respects."[2] *Id.*, (citing *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997)).  Which factors are material will vary from case to case, and "courts should make an independent

---

[2] Plaintiff misstates this Circuit's precedent as requiring only "that the individuals with whom a Plaintiff attempts to compare herself be similarly situated in meaningful material respects."  (Pl. Opp. 14.) (citing *Schumway* [sic] *v. United Parcel, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).  The relevant language from *Shumway* states that "the individuals with whom Shumway attempts to compare herself must be similarly situated in *all* material respects."  *Id.* at 64 (emphasis added).

determination of the factors relevant to each case….There should be an 'objectively identifiable basis for comparability.'" *Id.* (quoting *Cherry v. American Tel. & Tel. Co.*, 47 F.3d 225, 229 (7th Cir. 1995)).

Plaintiff offers a number of potential comparators, but none are similarly situated to plaintiff in a crucial material respect: none were members of Chris Troisi's team at the time their requests were decided. In order to be similarly situated with respect to AWA requests, other employees must have had the same supervising team leader as the plaintiff. *See Shumway*, 118 F.3d at 64 (fact that decision-maker had not also supervised purported comparators supported conclusion that they were not similarly situated); *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531, 1546-47 (S.D.N.Y.1986) (concluding that "in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff" in a case involving discriminatory application of discretionary discipline) *aff'd*, 814 F.2d 653 (2d Cir.1987); *Lambert v. New York Office of Mental Health*, No. 97-1347, 2000 U.S. Dist. LEXIS 5197, at *30 (E.D.N.Y. Apr. 24, 2000) ("in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff"). Pursuant to Zurich's policy, decisions to allow flexible work arrangements are "based on individual needs" and "are made on a case-by-case basis." (Def. 56.1 Stmt. ¶ 8.) The factors to be considered in deciding an AWA request are employee specific: an employee needs to have a "proven record of achieving high performance" and have adequately shown he or she could perform their job within the proposed AWA. (*Id.*) Accordingly the team leaders, with their close knowledge of each employee's work product, have discretion to decide the requests of their team members. Each team leader might use his or her discretion differently. For

example, two could have different opinions as to what constitutes a "proven record of achieving high performance," when a request is for child-care purposes, or whether permitting employees to work from home is, as a general matter, in the best interests of the company. Accordingly, the decisions made by other team leaders on AWA requests outside of Troisi's team are not probative of whether plaintiff was discriminated against when Troisi denied her AWA request.

None of plaintiff's purported comparators had Troisi as their team leader at the time of their AWA requests. (Def. 56.1 Stmt. ¶ 58; Baney Decl. ¶ 2; Troisi Decl. ¶ 8.) Although plaintiff points out that they made requests pursuant to the same policy, and "reported to the same chain of command" above the team leader level, (Pl. Opp. 15.), this does not cure the difference in their situations because it does not account for Troisi's role in the process. Accordingly, plaintiff has not shown that her employer treated her differently than other employees outside her protected group, and no inference of discrimination arises.

Ironically, the only proper comparator to plaintiff is plaintiff herself—when she filed her first request to work from home in December 2003. In that case a request to work from home by someone with exactly plaintiff's characteristics was granted. However that comparator was (obviously) within plaintiff's protected group, so the approval of that request cuts *against* an inference of discriminatory circumstances.

Troisi's history of treating plaintiff well also refutes an inference of discrimination. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) ("[W]here the individual who made the decision identified by a plaintiff as an adverse employment action is the same person who previously promoted that employee, it is

difficult to impute…an invidious motivation, to that individual."). Troisi interviewed and helped hire plaintiff, gave plaintiff a raise, and gave her generally positive and constructive performance reviews. With Troisi's approval plaintiff was permitted to work from home in the months prior to her pregnancy, enjoyed an extension of her maternity leave, and was permitted to alter her return schedule to accommodate the care of her newborn child. Plaintiff did not have a fax machine, so Troisi agreed to take care of her faxing when she worked from home. (Troisi Dep. 81:19-23.) Her only complaint about her flexible maternity leave—which is now the subject of this Title VII action—is that after all of this she was not permitted to temporarily telecommute in order to address a baby care issue. These actions do not comport with an invidious intent.[3] Given Troisi's constructive working relationship with plaintiff and the lack of evidence supporting an inference of discrimination, no reasonable juror could find that the telecommuting request was denied in circumstances giving rise to an inference of discrimination.

### C. Legitimate Business Reasons

Assuming, *arguendo*, that plaintiff had established a *prima facie* case, summary judgment would nonetheless be appropriate. Proceeding to step two of the *McDonnell Douglas* framework, the burden shifts to the employer who must provide a legitimate, nondiscriminatory business rationale to justify the allegedly discriminatory decision. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). Zurich has provided two legitimate, nondiscriminatory business reasons for denying plaintiff's request to telecommute. First, the company

---

[3] Interestingly, plaintiff identifies her disagreement with Troisi over the size of her November 2003 raise as the cause of the ill will Troisi allegedly has. (Pl. Decl. ¶ 26.) Plaintiff, however, does not claim that Troisi's decision as to the size of her raise was a discriminatory act. If this is the cause of Troisi's alleged ill will it hardly supports an inference that Troisi's acts evince racially discriminatory animus.

asserts that plaintiff's job performance did not rise to the "superior performer" level that the AWA policy calls for. This justification is supported by the record: plaintiff's performance evaluations—which are not alleged to be discriminatory—were only slightly above average and she had worked at the company for less than two years. Second, defendant claims that it denied the request because it was based on plaintiff's need to provide childcare, when the request form specifically states that "telecommuting is not a substitute for dependent care." (Def. 56.1 Stmt. ¶ 8.)

When the employer provides a legitimate, nondiscriminatory rationale, the presumption created by the *prima facie* case "drops out." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164 (2d Cir. 2001). For plaintiff to survive summary judgment, then, she must have supplied evidence from which a reasonable juror could conclude that the proffered reasons are not true reasons, but are merely pretext for the real discriminatory motivation. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

While plaintiff correctly states that "a plaintiff may be able to put into questions [sic] the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise," Pl. Opp. 13 (quoting *DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993)), Zurich's purposes are not implausible, absurd, or unwise. Requiring employees to come into work every day is a practice followed by the overwhelming majority of businesses worldwide, and allowing an exception to that requirement only to those superior employees who will not be distracted by child-care responsibilities is one reasonable approach to business management.

Aside from conclusory allegations that Zurich's business justifications are pretextual, plaintiff neither presents any evidence nor makes any legal argument supporting those assertions. The surrounding facts do not help plaintiff either. As discussed above, there is nothing in the record supporting an inference of discrimination, and a few undisputed facts actually refute such inference. She has not alleged or demonstrated any racially charged language or comments made by anyone at Zurich. The only other request for telecommuting made by a similarly situated employee was the one granted to plaintiff just before she went on maternity leave. The individual accused of making the discriminatory decision recommended that plaintiff be hired, gave her a raise, accommodated her first telecommuting request, personally sent her faxes for her while she worked at home prior to her due date, extended her maternity leave, and gave her the option of working part time upon her return. No reasonable juror would conclude that defendant's business justifications—which were in a written policy and are consistent with the undisputed evidentiary record—are a pretext for discrimination.

As the foregoing discussion demonstrates, plaintiff did not suffer an adverse employment action with respect to her telecommuting request, has not shown that the decision was made in circumstances giving rise to an inference of discrimination, and has not produced any evidence that defendant's business justifications for the decision were a pretext for discrimination. Accordingly, summary judgment for defendants on plaintiff's discrimination claim is granted.

## II. Alleged Discrimination in Pay

Although plaintiff did not claim discrimination specifically with regards to pay in her Amended Complaint, she contends in her summary judgment papers that she was

paid less than some of the white claims counsel in her department. If true this disparate treatment could support a charge of discrimination. However when an individual's salary falls within the middle of a range, the mere existence of other higher paid employees does not necessarily give rise to an inference of discrimination. *See Lapsley v. Columbia University-College of Physicians & Surgeons*, 999 F.Supp. 506, 517 (S.D.N.Y. 1998) ("Plaintiff…maintains that she was paid less than similarly-situated non-African American coworkers. The indisputable facts, however, show that she is wrong…. Even a cursory examination of [employee salaries] … reveals no significant disparity in Lapsley's base salary, much less a marked disparity that would permit an inference of discriminatory intent. Reasonably read, the[] numbers could not sustain an inference of discriminatory motive.") (pointing out that plaintiff's salary was "by no means near the low end" of a range of employee salaries). Although some employees were in fact paid more than plaintiff, several white co-workers were also paid less, and the record reflects a range of salaries for new hires.[4] In fact, plaintiff was paid the median salary for individuals hired around the time she was. Of the other employees (all white) hired in plaintiff's department in 2002 and 2003, two were paid less than plaintiff, two were paid more, and two had the same starting salary as plaintiff. (Def. 56.1 Stmt. ¶ 47, Reale

---

[4] Although in her 56.1(b) statement she "denies" defendant's statement of undisputed facts regarding employee salaries, she offers no contrary evidence. Rather, she states: "Denied. The only similarly situated Non Black or Hispanic employees that were provided to Plaintiff's Counsel, and were subject to review or cross examination by same, were those who made more money and got more PTO's, [sic] during the relevant time period." (Pl. Counter 56.1 Stmt. ¶ 46) (citing language from plaintiff's declaration that does not address the salaries or benefits of Zurich's hires). Yet these figures are sworn to in the Reale Declaration and proven by documentary evidence in the form of individual personnel files. (Reale Decl. ¶ 5, Ex. A.) Aside from bare denial of this information, plaintiff does not "by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). "The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005).

Decl., ¶5, Ex. A.) Moreover, plaintiff listed "Open" as the salary request on her job application. (Nuwesra Decl. Ex. D.) Most of the other applicants filled in a desired figure, which some received. (*Id.*) In the absence of any evidence of a pay disparity that could plausibly evidence discriminatory intent, plaintiff's equal pay claim is dismissed.

### III. Plaintiff's Claim for Retaliation is Also Dismissed

Defendant has also moved for summary judgment on plaintiff's claim that Zurich retaliated against her for complaining about her allegedly discriminatory treatment. Plaintiff asserts that the retaliation took the form of baseless criticism of her work and the bulk transfer to her of undesirable files.[5] In addition to prohibiting discrimination on the basis of race, Title VII through its anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee because that individual "opposed any practice" made unlawful by Title VII. 42 U.S.C. § 2000e-3(a).

Like employment discrimination claims, retaliation claims are analyzed under the three-part burden shifting analysis set forth in *McDonnell Douglas*, 411 U.S. 792, 93 S.

---

[5] Plaintiff also alleges without argument that she was forced to resign. (Am. Comp. ¶ 32.) Under the doctrine of constructive discharge, an employee's voluntary resignation can be treated as a constructive termination (and in turn an adverse employment action) if certain requirements are met. *See e.g. Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987); *Parker v. Chrysler Corp.*, 929 F.Supp. 162, 166 (S.D.N.Y. 1996).

> A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation….the trier of fact must be satisfied that the … working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Lopez*, 831 F.2d at 1188. The deliberateness requirement is a serious one, and constructive discharge *cannot* be shown "simply through evidence that an employee was dissatisfied with the nature of his assignments … [or] that the employee feels that the quality of [his] work has been unfairly criticized … [or] merely [because] the employee's working conditions were difficult or unpleasant." *Stetson v. NYNEX Service Co.*, 995 F.2d 355, 361 (2d Cir. 1993). Plaintiff has not adduced any evidence that Zurich deliberately created intolerable working conditions in order to force her resignation. Had plaintiff properly alleged the constructive discharge issue, it would not have survived summary judgment.

Ct. 1817; *see Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 94-95 (2d Cir. 2001). First, in order to make out a *prima facie* case of retaliation, a plaintiff must produce "evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected participation or opposition under Title VII, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action." *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see e.g. Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-206 (2d Cir. 2006); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "Although the burden that a plaintiff must meet to establish a prima facie case at the summary judgment stage is *de minimis*, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Wright v. Stern*, 450 F.Supp.2d 335, 373-374 (S.D.N.Y. 2006) (citing *Cronin v. Aetna Life Ins.*, 46 F.3d 196, 203-04 (2d Cir. 1995)). As with discrimination claims, the *prima facie* case is not the end of the inquiry. "Once the plaintiff has established a *prima facie* case, defendant must proffer a legitimate, non-discriminatory reason for the adverse action. If it does so, then the burden shifts back to the plaintiff to demonstrate pretext." *Slattery*, 248 F.3d at 95.

Crediting plaintiff's declarations and deposition testimony for purposes of a summary judgment motion, plaintiff engaged in a protected activity by complaining of discrimination to her supervisor and by bringing that complaint to human resources, and Zurich knew of that activity. Therefore plaintiff has satisfied the first two prongs of a *prima facie* case for retaliation.

As for the third prong, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006); *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006). The criticisms plaintiff received in the instant case were uniformly constructive, employment-based, and unassociated with negative job consequences. A reasonable employee would not be dissuaded from filing a discrimination complaint merely because her supervisor gave her constructive employment-based criticism. *See Pacheco v. New York Presbyterian Hospital*, 593 F.Supp.2d 599, 629 (S.D.N.Y. 2009) (holding that criticism did not constitute an adverse employment action because plaintiff could not show that "the criticism was unwarranted or that the criticism had any tangible job consequences"); *Carmellino v. District 20 of New York City Dep't of Educ.*, No. 03-5942, 2006 WL 2583019, at *32 (S.D.N.Y. Sept. 6, 2006) (holding that negative evaluations were not actionable, especially when they did not result in "any negative consequences"); *Weeks v. New York State (division of Parole)*, 273 F.3d 76, 85-86 (2d Cir. 2001) ([C]riticism of an employee…is not an adverse employment action."); *Hernandez v. Industrial Medicine Associates*, No. 04-6491, 2006 WL 2669378, at *13 (W.D.N.Y. Sept. 15, 2006) ("Collett reminded plaintiff to follow the company's rules regarding work hours and telephone calls, and Toeper sent e-mails to Collett regarding plaintiff's work performance. These actions had no real adverse impact on plaintiff."). Perhaps if Troisi had used an especially harsh tone, or had indicated a direct retaliatory connection to plaintiff's discrimination complaint, or had associated negative job

consequences with the criticisms, then there might have been an adverse employment action. However here the criticisms indicated no associated adverse action and were friendly and constructive, [6] much like similar criticisms made before plaintiff's maternity leave.[7] Thus these criticisms do not constitute an adverse employment action.

Nor can the bulk file transfers that plaintiff received constitute an adverse employment action. It was plaintiff's ordinary job to manage claims files just like the ones transferred to her, and "[n]o reasonable employee would think being asked to perform tasks that are part of her job description constitute[s] a materially adverse employment action." *Martin v. MTA Bridges & Tunnels*, 610 F.Supp.2d 238, 254 (S.D.N.Y. 2009); *see Hinton v. City College of New York*, No. 05-8951, 2008 WL 591802, at *27 (S.D.N.Y. February 29, 2008) (holding that college professor who was dissatisfied with teaching assignments did not suffer adverse employment action). Even

---

[6] For example, on June 22, 2004 Troisi wrote the plaintiff:

> Mirna, As you may know, upper management periodically does checks for in-box counts (we just discussed this at a team manager meeting). Your count is high (currently over 130 documents). It looks to me like some of it are file transfer notices and a few notices of remote file sends. Maybe you could drop these to file and keep a separate list of files you need to review? This would clear out some of your in-box and it make it [sic] more manageable. Also, are these all files that you haven't reviewed yet? Let me know if you need help in organizing any of this. Thanks, Chris

(Reilly Decl. Ex. 1.)

[7] For example, on June 24, 2003 Troisi wrote the plaintiff:

> Mirna, I returned your denial on 941-0106565. I think this is the one I noted on your run. I could not find the policy in the file or in your in-box. From your Znotes, I know there were some initial problems in getting the correct policy. In any case, you need a diary system. Looks like things dropped off the radar for over three months on this claim and may have gone longer. This is especially important with denials because in some states, coverage defenses are deemed waived if the denial/ROR is issued after 30, 45, 60 days. As a rule, our department gets the denial letter out in 30 days. ¶ I am going to be sending an e-mail to everyone regarding diary system. Also you may want to consider keeping a running list of ROR and denials and then cross them off as you do them. It's just another check. Thanks, Chris

(Reilly Decl. Ex. 1.)

assuming the transfer of files was an adverse action, plaintiff has not rebutted Zurich's proferred legitimate business justification for the transfers. It is undisputed that when plaintiff went out on maternity leave her old files were transferred—in bulk—to recent hire Christopher Carucci. (Def. 56.1 Stmt. ¶ 77.) Zurich used bulk transfers when claims counsel came or went in order to maintain some equilibrium in the number of files assigned to each employee. (*Id.* at ¶ 83.) Thus upon her return from maternity leave plaintiff received a bulk transfer of files from claims counsel Christine Miller, who was leaving the company at around the same time plaintiff was returning.[8] (*Id.* at ¶ 77.) No reasonable juror could conclude that this business justification is a pretext for a retaliatory purpose. Accordingly, plaintiff's retaliation claim could not survive summary judgment even if the bulk transfers constituted an adverse employment action.

## CONCLUSION

For the reasons stated above defendant's motion for summary judgment on all of plaintiff's claims is GRANTED in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendant and to close the case.

---

[8] Plaintiff's primary allegation of retaliation is the 80 file transfer that she received via the following email from Christine Miller, on which Troisi was copied:

> Welcome back Mirna –
> Hope you all are well.
> Per Chris, I am in the process of [transferring] 80 files to you. Below are the first few. Please feel free to contact me at any time about any of them. My znotes are pretty up to date, so that should be a good starting point for you. If I think of anything on any of them, I will let you know. Thanks. I would look at Marjorie Centrone first, as we need to affirm a disclaimer we already sent that the [insured] contested. Thanks.
> [File numbers listed]

Troisi Dec. Ex. A.

SO ORDERED.

Dated: New York, New York
       January 15, 2010

_____
Richard J. Holwell
United States District Judge